IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

CAROLYN SYDNOR,               )
                              )
      Plaintiff,              )
                              )
          v.                  )      1:10cv934
                              )
FAIRFAX COUNTY, VIRGINIA,     )
                              )
      Defendant.              )

## M E M O R A N D U M   O P I N I O N

This matter is before the Court on Defendant Fairfax County's ("Defendant") Motion for Summary Judgment. [Dkts. 19, 22 ("MSJ")]. For the following reasons, the Court will deny Defendant's Motion.

## I.  Background

This case arises out of a former Fairfax County, Virginia, employee's allegations of violations of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. (the "ADA").

### A.   Factual Background

#### i.    *The Public Health Nurse Position*

Plaintiff Caroline McKay Sydnor ("Plaintiff" or "Sydnor") was offered a position as a public health nurse with the Fairfax County Health Department on June 21, 2000, which she accepted on June 23, 2000. (MSJ ¶¶ 1, 2.) Her offer letter informed her that she would work in "clinic services," her "base

1

office [would be] located at the Herndon-Reston District Office"

("Herndon-Reston"), and that "service needs may require [her] to

work in other Health Department locations through the county on

a scheduled basis." (MSJ Ex. 2.)

As of June 30, 2003, the Position Description Form for

a Public Health Nurse listed the following physical requirements

for the essential duties of the position: "work is generally

sedentary; however, employee may be required to do some walking,

standing, bending and carrying of young children and light

weight items up to 15 lbs." (MSJ Ex. 3.) The description also

stated that seventy-five percent of Plaintiff's duties involved

providing clinic services and that she could be assigned to work

at various sites.[1] *Id.*

On January 10, 2005, Plaintiff received a letter

confirming that she had accepted an offer to transfer to a

"Public Health Nurse II" position at the Joseph Willard Health

Center ("Willard") under the supervision of Edwyna Wingo

("Wingo"). (MSJ Ex. 4.) According to Defendant, Plaintiff's

essential functions as a Public Health Nurse at Willard included

"administering of immunizations, venipuncture, planting

tuberculin skin tests, collecting lab specimens, providing

---

[1] Plaintiff submits an additional Position Description Form dated May 9, 2005,
which arguably indicates that as of that date, no more than forty percent of
her prescribed duties included clinic services (though in fact none of the
duties listed on the form are termed "clinic services"; it breaks down that
position's duties as 40% care coordination, 40% community education, 15%
professional development, and 5% responding to client and public questions).
(Plaintiff's Brief in Opposition to Summary Judgment ("Opp.") Ex. 9 at 3.)

screening and diagnostic tests, and providing pertinent health information to patients." (MSJ ¶ 4.)

Plaintiff was one of seven nurses assigned to Willard, one of whom was part-time. (MSJ ¶ 5.) They shared all the nursing duties; none specialized in any area. (MSJ ¶ 5.)

The full-time nurses took turns as "nurse of the day" ("NOD"). (MSJ ¶ 6.) The NOD's duties include responding to telephone calls and walk-in inquiries, calling patients with test results, and catching up on other work such as updating patient charts. *Id.* The NOD was also required to help out if there were too many patients for clinic staff to handle, and NOD duties were generally considered less important than working in the clinic. *Id.*

The parties disagree about whether the NOD includes a full-day's worth of responsibilities. (MSJ ¶ 6; Opp. at 4 ¶ 6.) The deposition transcripts relied on by both parties indicate, however, that while the NOD position must be *covered* for a full day, NOD-specific responsibilities, *ex*cluding clinic services, do not by themselves occupy a full day. (*See* MSJ Ex. 7 (Wingo Dep. Tr. at 17:14-18 ("But our NOD nurses, their day is not a full day of NOD responsibilities. They may be assigned to nurse of the day, but they may not have more than one or two hours of direct client contact during that period of time.")); Opp. Ex. 7

(Severo Dep. Tr. at 32 ("The policy says that we're supposed to have someone covering NOD eight hours a day.").)

Defendant claims that the purpose of rotating the nurse of the day position is to give the nurses a working knowledge of the different services at the clinic and a greater diversity of experience. (MSJ ¶ 6.) Plaintiff questions this, however, because all the nurses performed all of the clinic responsibilities. (Opp. at 4 ¶ 6.)

### ii. *Plaintiff's Surgery*

On January 28, 2009, Dr. John Campbell ("Dr. Campbell") performed surgery on Plaintiff's left foot and ankle. (MSJ ¶ 7.)

On October 15, 2008, Wingo wrote Dr. Campbell seeking details about the length of time Plaintiff would be out of work, and the restrictions she would face once she returned. *Id.* Dr. Campbell responded that "she will need to be out of work for approximately six weeks and then she can return with strict restrictions regarding her surgery site." (MSJ. Exs. 10, 11.)

On February 20, 2009, Dr. Campbell examined Plaintiff and issued a release indicating that she could return to work on Thursday, March 12, 2009. (MSJ. Ex. 12.) The release indicated that Plaintiff must be restricted to sedentary work, with no walking or standing, and with 10 minutes each hour to elevate her foot. *Id.*

Plaintiff first returned to work on Monday, March 16, 2009. (MSJ Ex. 5.) She was first given time to catch up on emails. (MSJ Ex. 5.) And Plaintiff admits that Defendant complied with her requested accommodations during that March. (MSJ Ex. 5.) She was subsequently assigned as NOD--a position she remained in until her separation from County employment. (MSJ Ex. 7.)

On March 19, 2009, Wingo requested clarification from Dr. Campbell regarding Plaintiff's work restrictions. (MSJ Ex. 13.) His March 20, 2009 response included the following restrictions: Plaintiff was required to wear a brace or boot, could walk or stand for only 15 minutes per hour with crutches, and was not permitted to engage in lifting or carrying. (MSJ Ex. 15.) She was permitted to work 40 hours per week on light duty. *Id.*

On March 20, 2009, Dr. Campbell issued a second back-to-work release, forecasting that Plaintiff could return to full duty on May 18, 2009. (MSJ. Ex. 15.)

In April, 2009, Plaintiff was assigned to work as NOD at Herndon-Reston for a total of ten days over approximately four weeks. (MSJ Ex. 5.) Defendant claims that Plaintiff did not request any modification of her duties either before or during this period despite knowing that the NOD position at Herndon-Reston was more physically demanding than it was at

Willard.  (MSJ ¶ 11.)  Plaintiff argues, however, that she constantly requested to work in the clinic, not as NOD, and that she requested to work in a call center on April 28, 2009, but that Wingo decided that work was "not safe" for her.  (Opp. at 5 ¶ 11.)  When Plaintiff was not working at Herndon-Reston, she was working at Willard.  (MSJ ¶ 11.)

On April 29, 2009, Plaintiff was placed on Family and Medical Leave Act ("FMLA") leave.  (MSJ ¶ 12.)  She had been on FMLA leave at various times over the past 12 months, but her FMLA leave was not exhausted.  *Id.*  Her primary care physician, Dr. Samuel Jones ("Dr. Jones") completed her FMLA documentation. *Id.*  On page 2 of the "Certification of Heath Care Provider" section of that documentation, Dr. Jones identified the job functions Plaintiff was unable to perform as: "can't walk without cast boot and use of wheeled scooter/therefore has a difficult time performing clinical nursing duties in the clinic."  (MSJ Ex. 18.)

From April 29, 2009, to the termination of her employment, Plaintiff used FMLA leave intermittently for physical therapy, medical appointments, and absences due to illness.  (MSJ. ¶ 14.)  The light-duty tasks she was assigned also did not equate to 40 hours of work per week, and she was charged FMLA leave for the remaining time that she did not work. (MSJ ¶ 14.)  Plaintiff alleges, however, that Wingo "tortured"

6

her by improperly refusing to assign her full-time work and deducting the time she was prohibited from working from her FMLA leave. (Opp. at 5 ¶ 12; *id.* at 7 ¶ 22.)

On May 15, 2009, Plaintiff began a new FMLA leave period, with Dr. Jones again completing the same paperwork and including the same comments, except this time adding that "use of a lightweight, portable wheelchair would facilitate Ms. Sydnor's ability to perform her duties in the clinical setting." (MSJ Ex. 19.)

On May 12, 2009, Dr. Campbell issued an additional set of activity recommendations, including wearing a boot and walking or standing for no more than 30 minutes per hour. (MSJ Ex. 20.) And on June 9, 2009, he issued another set of recommendations, identical to the May 12, 2009 ones. (MSJ Ex. 21.) His notes from his June 9, 2009 appointment with Sydnor mention her primary care physician's recommendation of a wheelchair, but also encourage her to discontinue its use "as rapidly as possible to allow overall conditioning and strength as well as balance." (MSJ Ex. 22.)

Plaintiff admits that Wingo assigned her to duties consistent with Dr. Campbell's then-prescribed restrictions in May and June 2009. (MSJ Ex. 5.)

On June 16, 2009, Plaintiff worked as a nurse at Willard for one four-hour period because the clinic was busy and

her help was needed.  (MSJ Ex. 5.)  When Wingo later asked

Plaintiff how it went, she responded that she had pain and

swelling in her foot.  (MSJ Ex. 5.)  Plaintiff claims these

symptoms were routine and that she wanted to work despite them.

(Opp. at 6 ¶ 18.)

Allegedly due to concerns about Plaintiff's safety,

patient safety, and Plaintiff's ability to work in the clinic,

Wingo removed Plaintiff from further clinic duties, even though

she was previously scheduled for additional clinic work that

week.  (MSJ Ex. 5.)  Wingo's supervisor, Shauna Severo, and Dr.

Gloria Addo-Ayensu, the Director of the Department, agreed that

Plaintiff's physical restrictions impaired her ability to

respond to emergency situations involving patients and to handle

an uncooperative child, and that there was a real potential that

she would experience further injury.  (MSJ ¶ 19.)

Plaintiff did not ask to be reassigned to the clinic

after this.  *Id.*

In July, 2009, Wingo assigned Sydnor to NOD at other

Department locations in Springfield, Mt. Vernon, and Falls

Church.  (MSJ ¶ 20.)  Sydnor did not object to these

assignments.  *Id.*  But she now claims that these assignments

required her to lift more than 20 pounds (to move her

wheelchair), violating her doctor's orders, and that neither she

nor her doctor were consulted regarding this change. (Opp. at 7 ¶ 20.)

On August 3, 2009, in responses to a request by Wingo, Dr. Jones provided an update and clarification on Plaintiff's medical status. (MSJ ¶ 21.) He was asked, "you are expected to respond to any emergency which may occur with a client. This may involve breaking a fall when a client has fainted or assisting the client safely to the floor. Given the fact that you are in a wheelchair, can you safely respond to an emergency?" (MSJ Ex. 24.) He answered "no." *Id.*

Dr. Jones was also asked whether Plaintiff could fulfill the requirements of "do[ing] some walking, standing, bending, and carrying of young children or light weight equipment up to 15 pounds in weight," and again answered "no," stating that he did not know when Plaintiff could resume these duties. *Id.* Plaintiff argues that this question was based on the 2003 job description, instead of the 2005 description (Opp. at 7 ¶ 21; *see also supra* note 1.), but the distinction seems of little relevance, as *both* descriptions state that these are physical requirements of the position. (MSJ Ex. 3; Opp. Ex. 8.)

On August 4, 2009, Dr. Campbell issued a new set of activity recommendations for Plaintiff, mirroring the May 12 recommendations except that Plaintiff was limited to twenty minutes of walking or standing per hour. (MSJ ¶ 25.)

On August 6, 2009, Dr. Jones indicated by letter that Plaintiff would have a "very difficult time" as a clinic nurse without "significant accommodation," though he did not specify what accommodations would suffice, and neither party inquired as to what he had in mind. (MSJ ¶ 24; Opp. at 7 ¶ 24.)

On September 29, 2009, Dr. Campbell issued another set of activity recommendations, continuing the August 4 recommendations except for permitting Plaintiff to wear the brace or boot on an "as needed" basis and ordering that she drive only to commute to and from work. (MSJ. ¶ 25.) Dr. Jones repeated these recommendations on October 26, 2009. *Id.*

On October 16, 2009, Wingo advised Plaintiff that her 480 hours of FMLA leave would expire on November 9, and that she could "request" additional leave, but Plaintiff did not do so. (MSJ ¶ 26.) No evidence is in the record that, had Plaintiff requested additional leave, she would have received it.

On November 9, 2009, Wingo proposed Plaintiff's separation from employment because Plaintiff had exhausted her FMLA leave and was still--in Defendant's view--unable to perform the essential duties of her job. (MSJ ¶ 27.)

Plaintiff responded on November 12, 2009, with a letter to Dr. Addo-Ayensu. (MSJ Ex. 31.) The letter claimed that Plaintiff is "willing and able to work in a full time capacity with some modification," and went on to suggest a

series of possible modifications, but did not mention a wheelchair. *Id.*

Plaintiff met with Dr. Addo-Ayensu, and during the meeting, he offered for Plaintiff to work in the H1N1 Call Center through the end of December 2009, after which time, he allegedly told Plaintiff that she would be fired. (Opp. at 30.) She declined the offer. (MSJ ¶ 30.)

On November 23, 2009, Plaintiff was terminated from her position. (MSJ ¶ 31.) Her termination letter states two restrictions as dispositive: (1) being limited to walking and standing 20 minutes per hour and (2) being limited to lifting and carrying less than 20 pounds. (MSJ Ex. 32.) It also notes that public health nurses must "be able to quickly and safely respond to medical emergencies involving clients, . . . [and,] depending on staffing needs, . . . be deployed to other work sites." *Id.*

Plaintiff admitted at the time of her deposition that she would be unable to perform as a clinic nurse and that she is on long term disability. (MSJ ¶ 32.) She has multiple chronic medical conditions, including fibromyalgia, inflammatory arthritis, back and knee problems, and she claims that on most days she suffers pain at a level of ten on a scale of one to ten. *Id.* She has pain in her left wrist that affects her dexterity and requires the use of a brace or splint. *Id.*

11

Plaintiff raises several additional allegations regarding Defendant's views of people in wheelchairs. She claims that Wingo concluded that she should retire on disability before knowing anything about her condition besides that she was in a wheelchair. (Opp. at 11.) She claims Wingo stated that although most nurses would need help if a 200 pound person fainted, those nurses that are not in wheelchairs are "functional," "up on [their] feet, and [have] got two hands and feet to be able to do that." *Id.* She claims that once when she was in her wheelchair, Wingo came in and said loudly enough for all the nurses to hear, "Carolyn, you need to get out of the clinic because you are taking up too much space." *Id.* And she notes that Dr. Addo-Ayensu stated "I wouldn't want someone, my life to depend on someone in a wheelchair to catch me when I fall." *Id.*

Plaintiff further alleges that Wingo mistakenly believed that Plaintiff could not walk at all, despite doctors' orders to the contrary, and that Wingo feared that Plaintiff might stick herself with a needle, despite an absence of doctors' opinions on the subject. (Opp. at 12.) Plaintiff claims that Wingo shared these allegedly mistaken beliefs with senior management and the human resources department. (Opp. at 13.) Finally, Plaintiff alleges that Wingo reached her conclusions about Plaintiff's abilities without talking to

Plaintiff or to her doctors. *Id.* Had Wingo done so, Plaintiff

claims, she would have learned of Plaintiff's techniques for

performing her job while in a wheelchair. *Id.* at 13-15.

## B. Procedural Background

Plaintiff filed her Complaint on August 20, 2010.

[Dkt. 1.] Plaintiff appeared to plead two counts under the ADA,

first for failure to make a reasonable accommodation, and second

for a hostile work environment. On February 10, 2011, Defendant

filed a Motion for Summary Judgment. Plaintiff filed a brief in

opposition on February 22, 2011, and Defendant filed a reply on

February 24, 2011 ("Reply"). This Court heard arguments on

February 25, 2011 (the "February 25 Hearing").

Defendant's Motion is before the Court.

## II. Standard of Review

Summary judgment is appropriate only if the record

shows that "there is no genuine issue as to any material fact

and that the moving party is entitled to a judgment as a matter

of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Evans v. Techs. Apps.

& Serv. Co.*, 80 F.3d 954, 958-59 (4th Cir. 1996) (citations

omitted). The party seeking summary judgment has the initial

burden of showing the absence of a material fact. *Celotex Corp.

v. Catrett*, 477 U.S. 317, 325 (1986). A genuine issue of

material fact exists "if the evidence is such that a reasonable

jury could return a verdict for the non-moving party."
*Anderson*, 477 U.S. at 248.

Once a motion for summary judgment is properly made
and supported, the opposing party has the burden of showing that
a genuine dispute exists.  *See Matsushita Elec. Indus. Co. v.
Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  The party
opposing summary judgment may not rest upon mere allegations or
denials.  Rather, the non-moving party "must set forth specific
facts showing that there is a genuine issue for trial."
*Anderson*, 477 U.S. at 248 (quotation omitted).

Unsupported speculation is not enough to withstand a
motion for summary judgment.  *See Ash v. United Parcel Serv.,
Inc.*, 800 F.2d 409, 411-12 (4th Cir. 1986).  Summary judgment is
appropriate when, after discovery, a party has failed to make a
"showing sufficient to establish the existence of an element
essential to that party's case, and on which that party will
bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.
In reviewing the record on summary judgment, "the court must
draw any inferences in the light most favorable to the non-
movant" and "determine whether the record taken as a whole could
lead a reasonable trier of fact to find for the non-movant."
*Brock v. Entre Computer Ctrs., Inc.*, 933 F.2d 1253, 1259 (4th
Cir. 1991) (citations omitted).

### III. Analysis

The ADA is violated where an employer fails to make "reasonable accommodations to the known physical and mental limitations of an otherwise qualified individual with a disability who is an applicant or employee."  42 U.S.C. § 12112(b)(5)(A).  In a failure-to-accommodate case, the plaintiff must show (1) that she had a disability within the meaning of the ADA, (2) that her employer had notice of her disability, (3) that she could perform the essential functions of the job with reasonable accommodation, and (4) that the employer refused to make such an accommodation.  *Rhoads v. FDIC*, 257 F.3d 373, 387 n.11 (4th Cir. 2001) (quoting *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 6 (2d Cir. 1999)).  "Implicit in the fourth element," moreover, "is the ADA requirement that the employer and employee engage in an interactive process to identify a reasonable accommodation." *Haneke v. Mid-Atlantic Capital Mgmt.*, 131 F. App'x 399, 400 (4th Cir. 2005) (per curiam) (citing 29 C.F.R. § 1630.2(o)(3)).  *See also Walter v. United Airlines, Inc.*, No. 99-2622, 2000 WL 1587489, at *4 (4th Cir. Oct. 25, 2000)("Once an employer's responsibility to provide a reasonable accommodation is triggered, it may be necessary for the employer to engage in an 'interactive process' to determine the appropriate accommodation under the circumstances.").

Under this framework, it appears undisputed that Plaintiff was disabled within the meaning of the ADA. The Court therefore turns to the remaining elements.

A.   Whether Defendant had Notice of Plaintiff's Disability

There is no question here that Defendant knew that Plaintiff had *a* disability. Defendant argues, however, that it knew too little to have received notice of that disability under the ADA.

The burden to provide notice of a disability under the ADA "is not a great one. . . . Adequate notice simply informs the employer of both the disability and the employee's need for the accommodations for that disability." *EEOC v. Federal Express Corp.*, 513 F.3d 360, 369 n.5 (4th Cir. 2008). Defendant faults Plaintiff's alleged failure to "characterize[] her condition as a disability for which she needed a reasonable accommodation." (MSJ at 21.) But as the Fourth Circuit explained in *EEOC v. Federal Express*, "With regard to an employee's obligation to inform his employer about needed ADA accommodations, . . . [t]he employee does not have to mention the ADA or use the phrase 'reasonable accommodation.'" *Id.* at 369. In other words, no magic words are needed to satisfy the notice requirement.

Defendant objects to the lack of specificity in the notice Plaintiff allegedly provided. For support, it cites

conflicting doctors' opinions (one recommending a wheelchair and the other not mentioning one), Plaintiff's failure to fill out an accommodation request form, Plaintiff's failure to correctly predict the duration of her disability, and Plaintiff's requesting no accommodation from Wingo.

In this Circuit, notice is typically found inadequate where the Plaintiff's medical condition was largely *hidden* from her employer, such that it would have been unreasonable to expect the employer to notice the disability and accommodate it. *Compare, e.g.*, *Barber v. Columbia Coll.*, No. 3:05cv3405, 2007 WL 2891657, at *3 (Sept. 28, 2007) (defendant never received notice of a medical report clearing the plaintiff for work, updating her medical condition, and easing her physical restrictions), *with Hensley v. Johnston Cnty. Bd. of Educ.*, No. 5:07cv231, 2010 WL 5437240, at *13 (E.D.N.C. Dec. 23, 2010) (rejecting an argument that simply "ask[ing] the defendants to accommodate [the plaintiff's] disability with a more appropriate . . . assignment" failed to provide notice because it did not  explain how the disability impaired the plaintiff's abilities or to inform the employer of the plaintiff's specific limitations). *See also Hedberg v. Indiana Bell Telephone Co.*, 47 F.3d 928, 932-34 (7th Cir. 1995) ("The ADA does not require clairvoyance.").

Here, although Defendant may not have received crystal-clear information regarding Plaintiff's exact prognosis, the information it received was sufficient to meet the ADA's notice requirement. Defendant knew that Plaintiff had foot surgery that resulted in limited functioning upon her return to work, such that *some* accommodation would be needed for her to continue working. That was enough to satisfy the ADA's notice requirement.

B.  Whether Plaintiff Could Perform the Essential Functions of Her Job with Reasonable Accommodation

An ADA violation occurs where a covered employer fails to take reasonable steps to accommodate an employee's disability, unless such steps would "impose an undue hardship on the operation of the business." 42 U.S.C. § 12112(b)(5)(A). The ADA defines "reasonable accommodations" as including:

> (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and
>
> (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

*Id.* § 12111(9).

An employer need not "go out of [its] way" to accommodate a disabled employee; it simply must act reasonably. *Schneider v. Giant of Maryland, LLC*, 389 F. App'x 263, 271 (4th Cir. 2010). It need not reassign an employee where doing so would bump another employee out of a position, *id.*, where it would require a shifting of essential functions of that employee's position to a different employee, *see Wells v. BAE Sys. Norfolk Ship Repair*, 483 F. Supp. 2d 497, 509 (E.D. Va. 2007) (citing 29 C.F.R. pt. 1630, app. § 1630.2(o)), or where it would require the employer to create a new position, *see id.* at 510 (citing *Lamb v. Qualex, Inc.*, 33 F. App'x 49, 59 (4th Cir. 2002)). More generally, "[a]n employer is not required to violate another employee's rights in favor of an employee with a disability." *Id.*

Here, Plaintiff argues that she could have fulfilled the essential functions of her position through use of a wheelchair.[2] (Opp. at 23.) Defendant summed up its response at the February 25 Hearing: "It doesn't matter what she thinks she can do. She has -- there was an extensive medical record that she couldn't." And indeed it is true that *most* of Plaintiff's medical reports indicated her inability to fulfill the duties of her position. But not all. Dr. Jones's May 15, 2009 report

---

[2] At the February 25 Hearing, this Court inquired as to whether Plaintiff contended that being assigned to the H1N1 Call Center was a reasonable accommodation she should have been offered. Plaintiff stated that it was not, and that the reasonable accommodation she should have been offered was to work in the clinic with a wheelchair. This Court will therefore restrict its analysis to that proposed accommodation.

stated that "use of a lightweight, portable wheelchair would facilitate Ms. Sydnor's ability to perform her duties in the clinical setting." (MSJ Ex. 19.) And no subsequent medical reports contradicted this.[3]

Defendant also notes that Plaintiff's position required that she be able to respond to emergency situations from time to time. Yet the main emergency situation Defendant seems to envision--the fainting patient (*see* MSJ Ex. 4)--is one for which Plaintiff claims to have a solution: put the patient on the exam table instead of a chair before giving him or her the shot. (Opp. at 14.) Plaintiff allegedly explained this practice to Wingo when Wingo told her that she would not assign her to work in the clinic again, "but Wingo still believed it was not safe." (Reply at 8.) Wingo may well have believed that, but her belief does not end the dispute about whether the practice was *reasonable*. And this Court is without a sufficient basis to find that practice inherently unsafe.

The other emergency appears to involve the risk that *Plaintiff* will be hurt by the occasional unruly child. "A significant risk of personal physical injury can disqualify a person from a position if the risk cannot be eliminated." *Knapp v. Nw. Univ.*, 101 F.3d 473, 483 (7th Cir. 1996) (citing *Chiari*

---

[3] Dr. Campbell's June 9, 2009 appointment notes encourage Plaintiff to discontinue use of the wheelchair to facilitate the recovery of her overall conditioning and balance, but they do not state an opinion on whether the wheelchair makes possible the fulfillment of the essential functions of clinic work. (*See* MSJ Ex. 22.)

*v. City of League City*, 920 F.2d 311, 317 (5th Cir. 1991)).  But

disqualification on this basis "must be examined with special

care . . . since almost all disabled individuals are at a

greater risk of injury."  *Knapp*, 101 F.3d at 473 (citing

*Bentivegna v. United States Dept. of Labor*, 694 F.2d 619, 622

(9th Cir. 1982)).  An employer must show "a reasonable

probability of substantial harm" that could not be eliminated.

*Knapp*, 101 F.3d at 473 (citing *Mantolete v. Bolger*, 767 F.2d

1416, 1422 (9th Cir. 1982)).

     Here, Defendant claims that Plaintiff herself

"testified in her deposition that she was at unusual risk of

pain from clinic work involving unruly children."  (MSJ at 19

(citing Sydnor Dep. Tr. at 230).)  That misrepresents what was

actually said in the deposition.  After Plaintiff stated that,

because of her fibromyalgia, "if someone pokes me, you know,

like the doctor . . . then, you know, I'm very sensitive."

(Sydnor Dep. Tr. at 230:4-9.)  The exchange continued,

> Q: What about a patient in the clinic, like
> an unruly child?  Would that hurt you?
>
> A: I've been there; done that.
>
> Q: So you've been kicked by an unruly
> toddler who was getting a shot and didn't
> want it?
>
> A: Absolutely.
>
> Q: And it hurt?

> A: Yeah, it was pain.  So -- you know, it's
> part of the job.
>
> Q: Okay.  But it was more painful – it's
> vastly more painful because of the
> fibromyalgia?

(Sydnor Dep. Tr. at 230:11-22.)  The last question was never answered directly.

This exchange shows that Plaintiff said nothing with respect to being at "unusual" risk of pain "from clinic work involving unruly children," let alone that such risk resulted from her foot surgery.  What she in fact said was first, that *her fibromyalgia*--a separate affliction from the disability that put Plaintiff in a wheelchair and allegedly justified her termination--makes her unusually sensitive to things like being poked by a doctor, and second, that getting kicked by an unruly toddler is something she has experienced as a nurse, and that it is a part of the job (*i.e.*, it is no big deal).  Plaintiff further asserts that, if necessary, she could have stood and lifted 20 pounds, and that typically it is the child's parents and/or an additional nurse who do any actual restraining when things get out of hand.  (Opp. at 9, 14 (citing Dr. Addo-Ayensu Dep. Tr. at 42:23-43:4) ("A kid screaming, most of the time the way we get the kids--the shots in these kids is--because they are kicking and fussing, mom has one end, somebody maybe has another end and the nurse is giving the shot.").)

As for the argument that "courts normally should defer to the reasonable medical judgments of public health officials," *see Doe v. Univ. of Md. Medical Sys. Corp.*, 50 F.3d 1261, 1266 (4th Cir. 1995) (citing *School Bd. Of Nassau Cnty. v. Arline*, 480 U.S. 273, 288 (1987)), it is of little relevance here. That language comes from the Supreme Court's *Arline* decision, and read in context, it pertains to employment decisions regarding persons with *contagious diseases*. *See Arline*, 480 U.S. at 287-88 ("In the context of the employment of a person handicapped with a contagious disease . . . this inquiry should include 'findings of fact, based on reasonable medical judgments given the state of medical knowledge about (a) the nature of the risk (how the disease is transmitted), (b) the duration of the risk (how long the carrier is infectious, (c) the severity of the risk (what is the potential harm to third parties), and (d) the probabilities the disease will be transmitted and will cause varying degrees of harm. In making these findings, courts should normally defer to the reasonable judgments of public health officials.'") (emphasis added). And whereas the "public health opinion" here that of a small group of individuals evaluating one employee's disability, the public health opinion in *Doe* was that the Centers for Disease Control and Prevention regarding HIV-positive health care workers, a seemingly more authoritative source. *Doe*, 50 F.3d at 1266.

There is also the fact that an essential function of
Plaintiff's position appears to have been the ability to travel
to different offices as needed.  (MSJ ¶ 2.)  Plaintiff claims at
one point that Wingo's assigning her to different offices
actually violated her doctor's orders by requiring her to lift
her 27 pound wheelchair (over the 20 pound limit imposed by her
doctor) (Opp. at 7 ¶ 20).  What Plaintiff argues *could* have been
done instead is to allow her access to a wheelchair housed at
each of her work sites so she would not have to bring her own,
or to arrange for another employee to lift her wheelchair in and
out of her car each work day.  (Opp. at 18.)

The essence of Plaintiff's argument is that she could
have performed the essential functions of her job in a
wheelchair, and this Court is without an evidentiary basis for
finding otherwise, or for finding that that accommodation would
have been unreasonable.  Thus, it remains in dispute whether
Plaintiff could have served as a public health nurse while in a
wheelchair.

C.   Whether Defendant Refused to Allow Plaintiff a
     Reasonable Accommodation

The ADA envisions an interactive process involving
both employer and employee to make a reasonable effort to
identify an appropriate accommodation for a disability.  *See* 29
C.F.R. pt. 1630, app.  But the absence of an interactive process
does not mean that the employee automatically prevails in his

action.  *See Rehling v. City of Chicago*, 207 F.3d 1009, 1016

(7th Cir. 2000).  Rather, the employee must show that the

employer's failure to engage in an interactive process resulted

in the failure to identify an appropriate accommodation.  *Id.*

Conversely, "[i]t is well settled that a request for

accommodation is not required where the disabled individual's

need for an accommodation is obvious."  *Brown v. Cnty. of

Nassau*, 736 F. Supp. 2d 602, 618-19 (E.D.N.Y. 2010).

Here, the evidence is inconclusive as to whether

Defendant refused to accommodate Plaintiff.  On one hand,

Plaintiff seems to have communicated very little with regard to

the proposed accommodation she now raises (the use of a

wheelchair), as evidenced by her letter responding to her

proposed termination:

> I provided [Wingo] and [Severo] with
> examples of *the tasks I can perform*.  I can
> work as the NOD, do STD prep and [patient]
> call backs, work at the H1N1 call center,
> or do x-ray [tuberculosis screening], to
> name a few. . . .  I was told by [Wingo]
> and [Severo] that if I can't do all the
> clinic duties that I can't work at all.
> The all or nothing approach seems extremely
> unfair.  The point is that there is a lot
> of work that I can do in the capacity of
> Public Health Nurse.  My supervisors have
> chosen instead to schedule other people to
> do the work that I can perform, *yet
> insisting that I need to work only in the
> clinic which is hard for me given my
> current condition*.

(MSJ Ex. 31 (emphasis added)).  The emphasized language casts doubt as to *when* she decided that using the wheelchair was the accommodation she wanted, as opposed to requesting non-clinic-services assignments.  Further, the long record of communications between Wingo and Plaintiff's doctors, often initiated by Wingo, suggests that Defendant was fairly attentive to Plaintiff's condition.

On the other hand, Plaintiff claims that this was the wrong kind of attention; that rather than genuinely searching for an accommodation for her, Defendant was in fact building the case to be rid of her.  Plaintiff cites as an example the hypothetical question Wingo put to Dr. Jones in August, 2009: "you are expected to respond to any emergency which may occur with a client.  This may involve breaking a fall when a client has fainted or assisting the client safely to the floor.  Given the fact that you are in a wheelchair, can you safely respond to an emergency?"  The result-oriented appearance of this hypothetical raises questions as to whether Defendant was attempting in good faith to find an accommodation for Plaintiff.

Moreover, the fact is inescapable that Defendant was told, by Dr. Jones, that a lightweight portable wheelchair "would facilitate [Plaintiff's] ability to perform her duties in the clinical setting."  (MSJ Ex. 19.)  This certainly appears to be "a release from a medical health professional which

essentially states that the employee has the ability to perform the essential functions of her job with reasonable accommodation." (*See* Reply at 10 (*quoting Kitchen v. Summers Continuous Care Center, LLC*, 552 F. Supp. 2d 589, 595 (S.D.W. Va. 2008)).) Defendant no doubt disputes Dr. Jones's assessment, but this communication at least shows that the wheelchair idea was raised during the course of Plaintiff's disability.

Defendant makes much of Plaintiff's alleged failure to request any accommodation. (Reply at 11.) But if all Plaintiff wanted was to return to her normal job and to perform the functions of that job in a wheelchair, what exactly should she have requested? Plaintiff was in a wheelchair at the time, making it obvious that she needed one. Not to mention that the workplace in question here is a public health facility, and it is hardly intuitive that wanting to use a wheelchair there would require permission.

Thus, a dispute remains as to whether Defendant refused to allow Plaintiff's desired accommodation--the use of a wheelchair. Summary judgment must therefore be denied.[4]

---

[4] The Court takes notice that, at the February 25 Hearing, Plaintiff represented that she was no longer pursuing a Hostile Work Environment claim against Defendant. Thus, at this stage of the case, the only claim remaining against Defendant is for failure to accommodate under the ADA.

## IV. Conclusion

For these reasons, the Court will deny Defendant's

Motion.


March 3, 2011                    _____/s/_____
Alexandria, Virginia                    James C. Cacheris
                          UNITED STATES DISTRICT COURT JUDGE